1  Ronald A. McIntire, Bar No. 127407
   RMcIntire@perkinscoie.com
2  Catherine N. Grech, Bar No. 291469
   CGrech@perkinscoie.com
3  **PERKINS COIE LLP**
   1888 Century Park E., Suite 1700
4  Los Angeles, California  90067-1721
   Telephone:  310.788.9900
5  Facsimile:  310.788.3399

6  Attorneys for Plaintiffs
   Baskin-Robbins Franchising LLC
7  and BR IP Holder LLC

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12  BASKIN-ROBBINS FRANCHISING            Case No.
    LLC, a Delaware limited liability
13  Company; and BR IP HOLDER LLC,        **COMPLAINT FOR INJUNCTION AND**
    a Delaware limited liability company, **DAMAGES**
14
                      Plaintiffs,
15
         v.
16
    ALAN A. CHUN, an individual,
17
                      Defendant.
18

19

20        Plaintiffs, Baskin-Robbins Franchising LLC and BR IP Holder LLC (hereinafter, unless

21  specifically identified, referred to as "Plaintiffs" or "Baskin-Robbins"), bring this civil action

22  against Defendant Alan A. Chun ("Mr. Chun" or "Defendant") and allege as follows:

23                       **PRELIMINARY STATEMENT**

24        1.    This is an action for breach of contract, trademark infringement, trade dress

25  infringement, and unfair competition arising from Defendant's repeated violations of his Franchise

26  Agreement with Plaintiffs.  Defendant was notified in writing that he was in default of the Franchise

27  Agreements based on his failure to pay required fees and other amounts to Plaintiffs.  Since

28  receiving the Notice to Cure on or about June 25, 2018, Defendant has failed to cure his breaches

                                    -1-
140982067.3

of the Franchise Agreement.  As a result of Defendant's repeated violations of the Franchise Agreement, Defendant is no longer entitled to an opportunity to cure his financial defaults. Accordingly, Plaintiffs recently sent a Notice of Termination to Defendant with respect to his Baskin-Robbins shop, thus terminating his Franchise Agreement.  Defendant continues to operate the Baskin-Robbins shop in violation of the Franchise Agreement.  Additionally, Defendant's continued use and enjoyment of Plaintiffs' trademarks, trade name, and trade dress after termination of the Franchise Agreement is a violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*  Plaintiffs seek injunctive relief, monetary damages, and other relief against Defendant for these violations.

## PARTIES

2.      Plaintiff Baskin-Robbins Franchising LLC is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts.  It is engaged in the business of franchising independent business persons to operate Baskin-Robbins shops throughout the United States.  Baskin-Robbins franchisees are licensed to use the trade names, service marks, and trademarks of Baskin-Robbins and to operate under the Baskin-Robbins system, which involves the production, merchandising, and sale of ice cream and related products utilizing a specially-designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and identification.

3.      Plaintiff BR IP Holder LLC is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts.  BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks.  Unless otherwise specified, Baskin-Robbins Franchising LLC and BR IP Holder LLC are collectively referred to herein as "Baskin-Robbins."

4.      Defendant Alan A. Chun is a natural person and a citizen and resident of the State of California.  At all times relevant to this action, Defendant was the owner and operator of a retail Baskin-Robbins shop located in San Mateo County, California, pursuant to a Franchise Agreement with Baskin-Robbins for that shop.

-2-

**JURISDICTION AND VENUE**

5.     This action arises, in part, under Chapter 22 of Title 15 of the United States Code, 15 U.S.C. § 1051, *et seq.* (the "Lanham Act"), and presents, *inter alia*, federal questions involving trademark infringement and unfair competition.

6.     This Court has jurisdiction pursuant to §§ 34(a) and 39 of the Lanham Act, 15 U.S.C. §§ 1116(a) and 1121, and 28 U.S.C. §§ 1331, 1332(a), 1338, and 1367(a). The amount in controversy, including the objects of the litigation, exceeds $75,000, exclusive of interest and costs.

7.     This Court has *in personam* jurisdiction over Defendant because he conducted business in this District, he is a resident of this District, and/or the events giving rise to Plaintiffs' claims occurred in this District.

8.     This Court has supplemental jurisdiction over any related state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and/or this is the judicial district in which Defendant is subject to personal jurisdiction.

**INTRADISTRICT ASSIGNMENT**

10.     Because this matter is an Intellectual Property Action, there is no basis for assignment to a particular location or division of the Court pursuant to Civil L.R. 3-2(c).

**FACTUAL BACKGROUND**

**<u>The Baskin-Robbins System</u>**

11.     Baskin-Robbins Franchising LLC is the franchisor of the Baskin-Robbins franchise system.

12.     BR IP Holder LLC is the owner of the trademarks, service marks, logos, emblems, trade dress and trade name "Baskin-Robbins," and related marks. Baskin-Robbins has the exclusive license to use and license others to use these marks and trade name and has used them continuously since approximately 1954 to identify Baskin-Robbins shops, and the ice cream and other products associated with those shops.

COMPLAINT FOR INJUNCTION AND DAMAGES

140982067.3

13.     BR IP Holder LLC owns numerous federal registrations for the mark "Baskin-Robbins" and related marks.  Each of these registrations is in full force and effect, and most of them are incontestable pursuant to 15 U.S.C. § 1065.  Each registration is *prima facie* evidence of the validity of the registration, of BR IP Holder LLC's ownership of the Baskin-Robbins marks, and of Baskin-Robbins' exclusive right to use those marks in commerce on the services and goods listed above, as provided in 15 U.S.C. §§ 1057(b) and 1115(a).

14.     The Baskin-Robbins marks are utilized in interstate commerce.

15.     The Baskin-Robbins marks have been widely advertised and promoted by Baskin-Robbins over the years.  As a result, the Baskin-Robbins marks have become famous throughout the United States.

16.     Baskin-Robbins and its franchisees currently operate more than 7,800 shops worldwide, including over 2,500 shops in the United States.  In the more than sixty (60) years since the Baskin-Robbins system began, millions of customers have been served in Baskin-Robbins shops.

17.     As a result of the extensive sales, advertising, and promotion of items identified by the Baskin-Robbins marks, the public has come to know and recognize the Baskin-Robbins marks, and associate them exclusively with products and services offered by Baskin-Robbins and its franchisees.  The Baskin-Robbins marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Baskin-Robbins, representing and embodying Baskin-Robbins' considerable goodwill and favorable reputation.

**Defendant's Obligations Under the Franchise Agreement**

18.     Defendant entered into a franchise agreement with Baskin-Robbins that granted him a franchise to operate a Baskin-Robbins shop utilizing the Baskin-Robbins system, as described in paragraphs 2 and 3 above as follows:

a.     On or about July 26, 2017, Defendant and Baskin-Robbins Franchising LLC entered into a franchise agreement that granted Defendant a franchise to operate a Baskin-Robbins restaurant at 901d Edgewater Blvd., Foster City, California  94404 (the "Franchise Agreement"). (A true and correct copy of the Franchise Agreement is attached hereto as **Exhibit 1**).

-4-

140982067.3

19.     Defendant was licensed to use the Baskin-Robbins trademark, trade name, and trade dress in accordance with the terms of the Franchise Agreement.

20.     Under the Franchise Agreement, Defendant agreed to use Baskin-Robbins' proprietary marks, including, but not limited to, its trademarks, service marks, logos, emblems, trade dress and other indicia of origin, only in the manner and to the extent specifically licensed by the Franchise Agreement.  (**Ex. 1**, Franchise Agreement §§ 2.4, 9 *et seq.*).

21.     Under the Franchise Agreement, Defendant agreed to, among other things, (i) pay a franchise fee equal to 5.9% of gross sales of the business, (ii) pay an advertising fee equal to 5.0% of gross sales of the business, (iii) pay late fees, interest and costs on unpaid monies due under the Franchise Agreement, and (iv) pay all sums owing and any damages, interest, costs and expenses, including reasonable attorneys' fees, incurred as a result of Defendant's defaults.  (**Ex. 1**, Franchise Agreement §§ 5 *et seq.*, 14.4.4).

22.     Defendant agreed that he would be in default under the Franchise Agreement if he breached any obligation under that Franchise Agreement, including failing to pay any of the required fees.  (**Ex. 1**, Franchise Agreement § 14 *et seq.*).

23.     Defendant agreed that Baskin-Robbins may terminate the Franchise Agreement if Defendant defaulted under the Franchise Agreement or if he failed to timely cure any default. (**Ex. 1**, Franchise Agreement § 14.6).

24.     Defendant agreed that upon the termination of the Franchise Agreement, his right to use the Baskin-Robbins proprietary marks and system would cease, and he would immediately cease to operate the franchised business, cease to use the proprietary marks and system, and not, directly or indirectly, hold himself out as a present or former Baskin-Robbins' franchisee.  (**Ex. 1**, Franchise Agreement § 14.7 *et seq.*).

25.     Pursuant to Section 14.5 of the Franchise Agreement, Defendant acknowledged that Baskin-Robbins would have no adequate remedy for Defendant's unauthorized use of Baskin-Robbins' proprietary marks and system and agreed not to contest the appropriateness of injunctive relief for such misuse.

COMPLAINT FOR INJUNCTION AND DAMAGES

**Defendant's Defaults and Terminations**

26.     Defendant breached the Franchise Agreement by failing to pay the required fees, and/or other amounts owed to Plaintiffs.

27.     Pursuant to the applicable provisions of the Franchise Agreement, on June 25, 2018, Baskin-Robbins provided Defendant with written notice of his material defaults under the Franchise Agreement and fifteen (15) days to cure the default (the "Notice to Cure").  (A true and correct copy of the June 25, 2018 Notice to Cure is attached as **Exhibit 2**).  The Notice to Cure specified, among other things, that Defendant's failure to timely cure his defaults would result in termination of the Franchise Agreement.

28.     Despite receiving the June 25, 2018 Notice to Cure, Defendant has failed to cure his breaches of the Franchise Agreement based upon his continued failure to pay the required fees and other amounts owed to Baskin-Robbins.  More than fifteen (15) days have passed since Defendant received the Notice to Cure and the default has not been cured.

29.     As a result of Defendant's failure to cure within the requisite time, on August 27, 2018, Baskin-Robbins provided Defendant with a written Notice of Termination of the Franchise Agreement (the "Notice of Termination").  (A true and correct copy of the August 27, 2018 Notice of Termination is attached as **Exhibit 3**).  The Notice of Termination terminated the Franchise Agreement, stated the grounds for termination, and requested that Defendant immediately comply with his post-termination obligations as set forth in the Franchise Agreement.

30.     Notwithstanding Defendant's non-performance under the Franchise Agreement and the resulting termination of the Franchise Agreement, Defendant has continued to operate the Baskin-Robbins shop using Baskin-Robbins' proprietary marks and system without having any right or license to do so.

31.     Defendant's continued unauthorized use of the Baskin-Robbins marks and system is causing and will continue to cause Baskin-Robbins irreparable harm, including, without limitation, mistake, confusion, or deception in the minds of the public as to the source, affiliation, and sponsorship of the shop and the goods and services offered therein.

COMPLAINT FOR INJUNCTION AND DAMAGES

32.     Defendant offers identical or substantially identical goods and services through his shop as are offered by Baskin-Robbins' authorized franchisees.   Upon seeing Defendant's unauthorized use of Baskin-Robbins' familiar and well-known marks, consumers are likely to be deceived into concluding that the shop, and the goods and services offered and sold therein, are subject to Baskin-Robbins' supervision, are sponsored or endorsed by Baskin-Robbins, and bear the marks pursuant to Baskin-Robbins' authority and permission.

33.     So long as Defendant continues to use Baskin-Robbins' marks and system in connection with the unauthorized operation of the shop, consumers have no practical way of knowing that Defendant is no longer affiliated with, or sponsored, authorized, or endorsed by Baskin-Robbins, and is operating the shop without Baskin-Robbins' authorization.  As a result, any consumer dissatisfaction with the shop, or with the goods and services offered in connection therewith, is likely to be attributed to Baskin-Robbins and its authorized franchised restaurants.

34.     Plaintiffs have been forced to engage undersigned counsel to represent them in this case.

35.     Plaintiffs are obligated to pay a reasonable fee for undersigned counsel's professional services provided in this case.

## COUNT I
### (Breach of Franchise Agreement)

36.     Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 35, inclusive.

37.     Baskin-Robbins has performed all of its obligations under the Franchise Agreement.

38.     Defendant's conduct described herein constitutes a breach of the above-described contractual obligations contained in the Franchise Agreement.

39.     Defendant's breach constitutes good cause for terminating the Franchise Agreement.

40.     As a result of Defendant's actions and inactions, Plaintiffs have incurred and continue to incur monetary damages in an amount that has yet to be determined.

COMPLAINT FOR INJUNCTION AND DAMAGES

140982067.3

**COUNT II**
**(Trademark Infringement)**

41.     Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 40, inclusive.

42.     The use in commerce of the Baskin-Robbins trademarks and trade names by Defendant outside the scope of the Franchise Agreement and without Baskin-Robbins' consent is likely to confuse or deceive the public into believing, contrary to fact, that the unauthorized activities of Defendant is licensed, franchised, sponsored, authorized, or otherwise approved by Baskin-Robbins.  Such unauthorized use of the Baskin-Robbins trademarks and trade names infringes the exclusive rights in its trademarks under Section 32 of the Lanham Act, 15 U.S.C. § 1114 and applicable state law.

43.     The conduct of Defendant was and is being done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

44.     As a result of the actions of Defendant, Plaintiffs have suffered and are continuing to suffer irreparable harm, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.

45.     Baskin-Robbins has no adequate remedy at law.  Defendant's conduct has caused, and if not enjoined, will continue to cause irreparable harm and damage to the rights of Baskin-Robbins in its marks and to the business, reputation, and goodwill of Baskin-Robbins.

46.     By reason of the foregoing, Baskin-Robbins is entitled to preliminary and permanent injunctive relief against Defendant, restraining further acts of trademark infringement.

**COUNT III**
**(Unfair Competition)**
**[15 U.S.C. § 1125(a)]**

47.     Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 46, inclusive.

48.     The use in commerce of Baskin-Robbins' trademarks and trade names by Defendant outside the scope of the Franchise Agreement and without Baskin-Robbins' consent is likely to

-8-

cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of Defendant's goods, services, or commercial activities by Baskin-Robbins.  Such unauthorized use of Baskin-Robbins' trademarks and trade names violates Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) and applicable state law.

49.     The conduct of Defendant was and is being done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

50.     As a result of the actions of Defendant, Plaintiffs have suffered and are continuing to suffer irreparable injury, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.  Baskin-Robbins has no adequate remedy at law.  Defendant's conduct described above has caused and, if not enjoined, will continue to cause irreparable damage to the rights of Baskin-Robbins and the Baskin-Robbins marks and to the business, reputation and goodwill of Baskin-Robbins.

**COUNT IV**
**(Unfair Competition and False Advertising)**
**[Cal. Bus. & Prof. Code §§ 17200 and 17500 *et seq.*]**

51.     Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 50, inclusive.

52.     Defendant's conduct as herein alleged constitutes unlawful, unfair, and misleading acts, business practices and advertising, in violation of Sections 17200 and 17500 *et seq*. of the California Business and Professions Code.  The acts and conduct of Defendant complained of herein have caused Baskin-Robbins irreparable injury, and will, unless restrained, further impair the value of the Baskin-Robbins marks and Baskin-Robbins trade name, reputation, and goodwill. Baskin-Robbins has no adequate remedy at law.

53.     Baskin-Robbins is informed and believes, and thereon alleges, that Defendant has unlawfully obtained profits through acts of unfair competition.  Defendant should be forced to disgorge such unlawful profits to Baskin-Robbins.

-9-

140982067.3

## COUNT V
### (Trade Dress Infringement)

54.     Baskin-Robbins realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 53, inclusive.

55.     Defendant's shop is identified by signs, exterior appearance, packaging, containers, and other items on which the words "Baskin-Robbins" appears in the same lettering style and in the same distinctive color scheme that Baskin-Robbins uses for the shops operated by Baskin-Robbins' licensees.

56.     The use by Defendant of trade dress that is identical to the Baskin-Robbins trade dress outside the scope of the Franchise Agreement constitutes a false designation of the origin of Defendant's shops, which is likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, or association of their shops with the Baskin-Robbins shops operated by Baskin-Robbins' licensees.  Such adoption of Baskin-Robbins' trade dress violates Section 43 of the Lanham Act, 15 U.S.C. § 1125, and the common law.

57.     The conduct of Defendant was and is being done knowingly and intentionally to cause confusion, or to cause mistake or deceive.

58.     As a result of the actions of Defendant, Plaintiffs have suffered and are continuing to suffer irreparable harm, and have incurred and are continuing to incur monetary damages in an amount that has yet to be determined.  Baskin-Robbins has no adequate remedy at law.  Defendant's conduct described above has caused and, if not enjoined, will continue to cause irreparable damage to the rights of Baskin-Robbins and the Baskin-Robbins marks and to the business, reputation, and goodwill of Baskin-Robbins.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.     Enter a declaratory judgment that Defendant's conduct violated the terms of his Franchise Agreement and constituted good cause for termination of the agreement;

2.     Enter an Order ratifying and enforcing the termination of the Franchise Agreement as of the effective date contained in the Notice of Termination;

-10-

140982067.3

3.      Enjoin Defendant, and his agents, servants, employees, attorneys, and all others in active concert or participation with them, from infringing upon the Baskin-Robbins trademarks, trade names, and trade dress, and from otherwise engaging in unfair competition with Baskin-Robbins;

4.      Enjoin Defendant, and his agents, servants, employees, attorneys, and all others in active concert or participation with them, from taking any actions that do not comply with all post-termination obligations under the Franchise Agreement;

5.      Enter a judgment in favor of Plaintiffs for the damages incurred as a result of the breach of the Franchise Agreement;

6.      Enter an Order that Defendant restore and/or disgorge to Plaintiffs all money or property or other benefits gained by Defendant as a direct and proximate result of Defendant's unfair competition and/or unfair business practices directed at Plaintiffs;

7.      Award Plaintiffs prejudgment interest in accordance with Section 35 of the Lanham Act, 15 U.S.C. § 1117 and applicable law;

8.      Award Plaintiffs their costs and attorneys' fees incurred in connection with this action pursuant to the Franchise Agreement and Section 35 of the Lanham Act, 15 U.S.C. § 1117, and all other and further general relief to which it may be entitled, together with interest thereon at the legal rate; and

9.      Award Plaintiffs such other relief as this Court may deem just and proper.

DATED:  September 6, 2018                    **PERKINS COIE LLP**

                                            By: */s/ Catherine Grech*
                                                Ronald A. McIntire
                                                Catherine N. Grech

                                            Attorneys for Plaintiffs
                                            Baskin-Robbins Franchising LLC
                                            and BR IP Holder LLC

COMPLAINT FOR INJUNCTION AND DAMAGES

140982067.3

# Exhibit 1

DocuSign Envelope ID: 559FFD66-1944-43C0---208F01BA34EC

PC# 334725

# FRANCHISE AGREEMENT

This Franchise Agreement ("Agreement"), dated __07/26/2017__, is made by and between Baskin-Robbins Franchising LLC, a Delaware Limited Liability Company and an indirect, wholly-owned subsidiary of Dunkin' Brands, Inc., with principal offices at 130 Royall Street Canton, Massachusetts 02021 ("Baskin-Robbins", "we", "us" or "our"), and Alan A. Chun, a California Resident (hereinafter individually or collectively referred to as "Franchisee," "you" or "your").

## CONTRACT DATA SCHEDULE

A.  Location of the Restaurant:                           **901d Edgewater Blvd, Foster City, California 94404**

B.  Baskin-Robbins Term: until **June 30, 2037**

C1.  Baskin-Robbins Renewal Fee:                        **Ten Thousand Nine Hundred Ninety Dollars And Zero Cents ($10,990.00)**

C2.  Baskin-Robbins Initial Training Fee:                **Two Thousand One Hundred Forty Dollars And Zero Cents ($2,140.00)**

D.  Baskin-Robbins Marketing Startup Fee:    **Three Thousand Dollars And Zero Cents ($3,000.00)** for current event, per Brand Standards for all subsequent branding or re-branding events

E1.  Baskin-Robbins Continuing Franchise Fee Rate:

**Five And Nine Tenths Percent       (5.9%) of Gross Sales**

E2.  Continuing Training Fee:                           **Three Hundred Dollars And Zero Cents ($300.00)** due upon execution, and annually thereafter at the then-current rate

F.  Baskin-Robbins Continuing Advertising Fee Rate:

**Five And Zero Tenths Percent       (5.0%) of Gross Sales**

G.  Baskin-Robbins Remodel Date:          **January 1, 2027 and again upon renewal, if applicable**
    Baskin-Robbins Refurbishment Date:    **January 1, 2022 and again on January 1, 2032**

H.  Address for notice to FRANCHISEE shall be at the Restaurant, unless another address is inserted here:
    _____

I.  **[Intentionally Omitted]**

(Initial) [AC]

J.  Addenda:
    [x] Addendum to Franchise Agreement – Baskin-Robbins Store Transfer Sales Increase Incentive Offer

Form last revised April 2017

1

DocuSign Envelope ID: 559FFD66-1944-43C... ...-208F01BA34EC

**TERMS AND CONDITIONS**
**© APRIL 2017**

**SECTION 1.  PARTIES**

1.0   This Agreement is a non-exclusive license to operate a Baskin-Robbins business granted by us and to you. The franchisee, location and term are as specified in the accompanying Contract Data Schedule.

**SECTION 2.  GRANT OF THE FRANCHISE**

2.0   As a result of the expenditure of time, effort and money, we have acquired experience and skill in the continued development of the Baskin-Robbins System (the "System"), which involves the conceptualization, design, specification, development, operation, marketing, franchising and licensing of restaurants and associated concepts for the sale of proprietary and non-proprietary food and beverage products.

2.1   In connection with the System, we own or have the right to license certain intellectual property. This property includes trademarks, service marks, logos, emblems, trade dress, trade names, including Baskin-Robbins®, and other indicia of origin (collectively, the "Proprietary Marks"), as well as patents and copyrights. The Proprietary Marks include trademarks on the Principal Register of the United States Patent and Trademark Office. From time to time we may supplement or modify the list of Proprietary Marks associated with the System.

2.2   As franchisor, we have the right to establish "Standards" for various aspects of the System that include the location, specifications, physical characteristics and quality of operating systems of restaurants and other concepts; the products that are sold; the qualifications of suppliers; the qualifications, organization and training of franchisees and their personnel; the timely marketing of products and our brand, including execution of marketing windows; and all other things affecting the experience of consumers who patronize our System. We make those Standards available to you in our manuals and in other forms of communication, which we may update from time to time. Complete uniformity may not be possible or practical throughout the System, and we may from time to time vary Standards as we deem necessary or desirable for the System. The Standards do not include any personnel or any tools, policies or procedures which we may make available for optional use; the franchisee alone will determine to what extent, if any, these optional tools, policies and procedures will be used in its operations.

2.3.  As franchisee, you are solely responsible for the conduct of your employees and for otherwise exercising day-to-day control over your franchised business.  You also have the responsibility to adhere to the Standards of the System as they now exist and may from time to time be modified, and you acknowledge that at the heart of the System and this franchise relationship is your commitment to that responsibility. Furthermore, you acknowledge that your commitment is important to us, to you, and to other franchisees in order to promote the goodwill associated with our System and Proprietary Marks, and that this Agreement should be interpreted to give full effect to this paragraph.

2.4 (a) Accordingly, for the Term of this Agreement, we grant you the license, and you accept the obligation, to operate a Restaurant (the "Restaurant") within our System, using our intellectual property, only in accordance with our Standards and the other terms of this Agreement. This license is non-exclusive and relates solely to the single Restaurant location set forth in the Contract Data Schedule. We retain the right to operate or license others to operate Baskin-Robbins restaurants and other concepts, and to grant other licenses relating to the Proprietary Marks, at such locations and on such terms as we choose. We may use or license others to use

v.BR 4/2017

2

DocuSign Envelope ID: 559FFD66-1944-43C5-208F01BA34EC

the Proprietary Marks in ways that compete with your location and that draw customers from the same area as your Restaurant.

2.4 (b) Conditional Renewal of Franchise. This Agreement shall not automatically renew upon the expiration of the Term. You have an option to renew the Franchise upon the expiration of the Term for one (1) additional term of twenty (20) years (the "Renewal Term") if, and only if, each and every one of the following conditions has been satisfied:

(i) You give us written notice of your desire to renew the Franchise at least twelve (12) months, but not more than eighteen (18) months (the "Renewal Notice Period") prior to the end of the Term.

(ii) You have maintained the Standards and otherwise sustained compliance with the terms and conditions of your Franchise Agreement (and lease with our affiliate or us, if applicable) over the Term of the Franchise Agreement; you must not have any uncured defaults under this Agreement at the time you provide notice; all your debts and obligations to us under this Agreement (and any lease if we are your landlord) or otherwise must be current through the expiration of the Term, including your Continuing Advertising Fee obligations to the Fund (as defined in Section 6); and we have not issued more than three (3) Notices to Cure or other default notices over the course of the ten (10) year period directly preceding expiration of the Term;

(iii) You execute and deliver to us, within 14 days (or any longer period required by law) after delivery to you, the then-current form of Franchise Agreement being offered to new franchisees at the time of renewal, including all exhibits and our other then-current ancillary agreements. The terms and conditions and fee structures in the then-current Franchise Agreement may differ from this Agreement;

(iv) We approve the site and the terms of any lease extension or new lease covering the Renewal Term, whether the lease for the Premises is with our affiliate or with a third party, including a third party in which you have an interest (and, if there is to be a new lease with a third party, you deliver to us our Option to Assume Lease executed by you and your landlord).

(v) You pay us our then-current renewal fee;

(vi) You and all of your direct and indirect shareholders, partners and members execute and deliver a termination of franchise agreement, in the form we prescribe from time to time that releases all claims that you may have against us, and our parents, affiliates and subsidiaries, and their officers, directors, shareholders and employees in both their corporate and individual capacities;

(vii) You Remodel the Restaurant on or before the expiration of the Term, in accordance with Section 8.1 of this Agreement;

(viii) If you lease the Premises from our affiliate, you agree that we have no obligation to exercise any lease option, if available, or otherwise extend the term of any prime lease for the Renewal Term to accommodate this Conditional Renewal Term, however, in the event we decide not to exercise our lease option, we will use reasonable efforts to effect a transfer of the lease to you as prime tenant; additionally, you acknowledge and agree that we have the right to relocate the Restaurant at the end of any Term, and in such event, the Conditional Renewal Term would apply to the relocated Restaurant should you qualify for it.

2.5 We will maintain a continuing advisory relationship with you by providing such assistance as we deem appropriate regarding the development and operation of the Restaurant. We may require that you designate a fully-trained person as our primary contact. We will advise on the selection of the Restaurant's site as well as its construction, design, layout, equipment, maintenance, repair and remodeling. We will advise on the training of managers and crew personnel with regard to brand Standards, however all training of your employees, whether or not it relates to brand Standards, shall remain your sole responsibility; on marketing and

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C| -208F01BA34EC

merchandising; on inventory control and record-keeping; and on other aspects of Restaurant operations. In support of our advisory relationship, we will make available to you our then-current manuals setting out our Standards, together with explanatory policies, procedures and other materials that may be useful to you in complying with those Standards. We shall continue our efforts to maintain high and uniform standards of quality, cleanliness, appearance and service for all Baskin-Robbins restaurants.

2.6 We have established a franchisee advisory council comprised of members elected by franchisees in accordance with an election process prescribed by us as well as members appointed by us. We will consult with this group from time to time. This council will serve solely in an advisory capacity.

## SECTION 3. DEVELOPMENT OF THE RESTAURANT

3.0 You agree that the Restaurant and any real estate controlled by you and appurtenant to the Restaurant (the "Premises") must be designed, laid out, constructed, furnished, and equipped to meet our Standards, and you must satisfy any conditions to our approval of the development. Any deviations from our Standards must have our prior written approval. Any plans that we provide to you, and our approval of any plans you submit to us, relate solely to compliance with our Standards and should not be construed as a representation or warranty that the plans comply with applicable laws and regulations. That responsibility is solely yours. At our written request, you must promptly correct any unapproved deviations from our Standards in the development of the Restaurant or Premises. If you lose the use and enjoyment of the Premises before the end of the Term, this Agreement will automatically terminate without further notice. If you do not open your Restaurant within fifteen (15) months of signing this Agreement, then we will have the right to terminate this Agreement; provided, however that this sentence does not serve to amend your Store Development Agreement ("SDA"), if any, or modify any Required Opening Date contained therein.

## SECTION 4. TRAINING

4.0 Before the Restaurant opens for business, and from time to time thereafter, we will make various mandatory and optional training programs regarding Standards that we have developed or obtained available to you, your management and your other Restaurant employees. We will conduct training programs regarding Standards, and we may require you to conduct training programs through your own properly certified (by us) trainers or supervisors. These programs may be conducted, at our option, in a Restaurant or other site, or through the internet or other electronic media. You agree to timely and successfully complete, and to require your management and your other Restaurant employees to timely and successfully complete, all training regarding Standards. Some training programs or systems may require the payment of fees.

4.1 You are responsible for your costs incurred in receiving any Standards training and in conducting your own training, including the cost of any materials and the salaries and travel expenses of yourself, your management, and your other employees. In the event that the Restaurant repeatedly fails to meet Standards, then in addition to whatever other remedies we may have, we may require you, your management and your other Restaurant employees to participate in additional training programs at your expense, and you may be required to reimburse us for the costs of providing such training.

4.2 If you are a new franchisee and you are entering the System through the acquisition of an existing location or you need to have additional individuals attend training, you will need to pay the Initial Training Fee set forth in the Contract Data Schedule.

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C/ -208F01BA34EC

## SECTION 5. FEES, PAYMENTS AND REPORTING OF SALES

5.0 **Initial Franchise Fee**. The amount and timing of payment of the Initial Franchise Fee is specified in the Store Development Agreement ("SDA") relating to the location. If there is no SDA, the amount is specified in the Contract Data Schedule, and payment is due upon the signing of this Agreement, which must occur prior to commencing construction of the Restaurant.

5.1 **Marketing Start-Up Fee**. In connection with a material branding or re-branding event such as the opening, re-opening or remodel of the Restaurant or any other event set forth in our Standards, you agree to undertake promotional activities in the manner and to the extent that we prescribe in accordance with our Standards. We will advise you in writing of the manner and timing of payment of such activities. If we have established a minimum dollar expenditure for your Restaurant opening promotional activities, that amount will be set forth on the Contract Data Schedule.

5.2 **Continuing Franchise Fees**. You agree to pay us a Continuing Franchise Fee on or before Thursday of each week, for the seven-day period ending at the close of business on Saturday, twelve days previous. The amount due should be calculated by *multiplying* (a) the Gross Sales of the Restaurant for that seven-day period *by* (b) the Continuing Franchise Fee percentage stated in the Contract Data Schedule. We will specify the means and manner of payment from time to time, in writing.

5.3 **Continuing Advertising Fee**. You agree to pay us a Continuing Advertising Fee on or before Thursday of each week, for the seven-day period ending at the close of business on Saturday, twelve days previous. The amount due should be calculated by *multiplying* (a) the Gross Sales of the Restaurant for that seven-day period *by* (b) the Continuing Advertising Fee percentage stated in the attached Contract Data Schedule. The Continuing Advertising Fee should be paid at the same time and in the same manner as the Continuing Franchise Fee, unless we specify otherwise, in writing.

5.4 **Additional Advertising Fee**. If two-thirds of the Restaurants in the Designated Market Area ("DMA") in which the Restaurant is located, *or* two-thirds of the restaurants in the continental United States, vote to support payment of Additional Advertising Fees for, respectively, a market-based or nationally-based program, you agree to pay such fees and your Restaurant will participate in that program. Any Additional Advertising Fees will be used only for the related program voted on by the restaurants. We will specify the means and manner of payment from time to time, in writing.

5.5 **"Gross Sales"** means all revenue related to the sale of approved products and provision of services (including but not limited to direct delivery, catering and/or delivery services through third parties) through the operation of the Restaurant, but does not include money received for the sale of stored value cards and deposited into a central account maintained for the benefit of the System; taxes collected from customers on behalf of a governmental body; or the sale of approved products to another entity franchised or licensed by us for subsequent resale. All sales are considered to have been made at the time the product or prepaid product voucher/card/coupon (excluding stored value cards) is delivered to the purchaser, regardless of timing or form of payment. Revenues lost due to employee theft are not deductible from Gross Sales. You must submit any wholesale account for our prior approval using the procedure we specify from time to time. We may withdraw our approval at any time.

5.6 **Taxes on Fees**. If any tax or fee other than federal or state income tax is imposed on us by any governmental agency due to our receipt of fees that you pay to us under this Agreement, then you agree to pay us the amount of such tax as an additional Continuing Franchise Fee.

5.7 **Late Fees, Interest and Costs**. If you are late in paying all or part of a fee due to us, then you must also pay us our then-current late fee and interest on the unpaid amount calculated from the date due until paid at

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C8-208F01BA34EC

the rate of one and one-half percent (1.5%) per month, or the highest rate allowed by law, whichever is less. You must also pay all collection charges, including reasonable attorneys' fees, incurred by us to collect fees that are due.

5.8  **Sales Reporting and Electronic Fund Transfer ("EFT")**.  You agree to participate in our specified program or procedure for sales reporting and payment of fees that are due, whether it is electronic fund transfer or some successor program, in accordance with our Standards. You agree to assume the costs associated with maintaining your capability to report sales and transfer funds to us.  In no event will you be required to pay any sums before the date they are due, as described above.

## SECTION 6.  ADVERTISING

6.0  We have established and administer The Baskin-Robbins Advertising and Sales Promotion Fund (the "Fund"), and direct the development of all advertising, marketing and promotional programs for the System. We may use up to twenty percent (20%) of Continuing Advertising Fees but none of Additional Advertising Fees for the administrative expenses of the Fund and for programs designed to increase sales and further develop the reputation and image of the brand. The balance, including any interest earned by the Fund, will be used for advertising and related expenses. The content of all activities of the Fund, including the media selected and employed, as well as the area and restaurants targeted for such activities, will be determined by us.

6.1  We are not obligated to make expenditures for you that are equivalent or proportionate to your contributions to the Fund, or to ensure that you benefit directly or on a pro rata basis from the Fund's activities. Upon your request, we will provide you with an audited statement of receipts and disbursements for the Fund that is audited by an independent, certified public accountant, for each fiscal year of the Fund.

6.2  From time to time, we may create a national or local promotional program(s) that, for a limited time, involves the giveaway of a specified product, or its sale at some specified price. We also may create programs for frequency and loyalty cards, and redemption of gift certificates, coupons, and vouchers the duration of which will be determined by us. If we designate any such program as mandatory, you agree to participate fully in that program.

6.3  If you wish to use any advertising or promotional material that you have prepared or caused to be prepared, then you must submit the material and the proposed use for our prior written approval in advance of any use, and discontinue such use when we require. Our prior written approval may take the form of guidelines.

## SECTION 7.  OPERATIONS

7.0  **Operating in Accordance with Our Standards**.  You agree to operate the Restaurant in accordance with all of our Standards, some of which are set forth in this section. Among other things, you agree to:

7.0.1  Keep the Restaurant open and in continuous operation for those days and hours that we prescribe from time to time, and use the Restaurant and Premises only as a Baskin-Robbins business, unless we give written approval to do otherwise;

7.0.2  Install and use only equipment, furnishings, fixtures, and signage that we approve, replace them as we may require, and source them from suppliers, of which we may be one that we have approved in writing;

7.0.3  Install and use a retail information system that we approve and whose information is continuously
v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C__-208F01BA34EC

accessible to us, for our access and use, through polling or other direct or remote means that we may specify;

7.0.4  Use only supplies, materials, and other items that we approve, and source them from approved suppliers, of which we may be one;

7.0.5  Sell all required products, sell only approved products, and source them from suppliers that we approve, of which we may be one, and maintain a sufficient supply of all approved products to meet customer demands at all times, unless you receive our written approval to do otherwise;

7.0.5.1  You will place orders with us or our designated supplier at such times and in such manner as we or our designated supplier prescribes from time to time. You will provide us or our designated supplier with means of access to the Restaurant's frozen storage facility for delivery in accordance with regular route schedules as we or our designated supplier prescribes from time to time. We or our designated supplier may refuse to process orders or to impose a reasonable late or delivery charge for orders that are not placed timely.

7.0.6  Hire and maintain a sufficient number of properly trained managers and employees to render quick, competent and courteous service to Restaurant customers in accordance with our Standards, to increase sales and to further develop the reputation and image of the brand. Neither party will, during the Term of this Agreement, directly or indirectly solicit or employ any person who is employed by the other or any of their affiliated companies.

7.0.7  Comply with all of our requirements relating to health, safety and sanitation;

7.0.8  Sell products to a third party (including other franchisees) for subsequent resale only with our prior written approval, and only if the product is approved for resale;

7.0.9  Keep our confidential manuals up-to-date and accessible in the Restaurant, and make them available only to those of your employees who need access to them in order to operate the franchised business; and

7.0.10  Timely execute marketing windows.

7.1  **Obey All Laws.**  You agree to comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining in any way to the occupancy, operation and maintenance of the Restaurant and Premises.

7.2  **Right of Inspection.**  You agree that our employees and agents have the right to enter the Restaurant and Premises without notice during hours in which the Restaurant is open for business to determine your compliance with Standards and this Agreement. During the course of any such inspection, we may photograph or video any part of the Restaurant. We may select ingredients, products, supplies, equipment and other items from the Restaurant to evaluate whether they comply with our Standards. We may require you to immediately remove non-conforming items at your expense, and we may remove them at your expense if you do not remove them upon request.

7.3  **Determination of Prices.**  Except as we may be permitted by law to require a particular price, you are free to determine the prices you charge for the products you sell.

7.4  **Conditions of Employment.**  You are solely responsible for all labor and employment decisions, including hiring, training, disciplining, promoting, discharging, scheduling, and setting wages and terms of employment with respect to the Restaurant. We do not mandate or control labor or employment matters for you or for your management or your other employees. You agree to comply with all civil and criminal laws, ordinances, rules and regulations related to employment, including wage and hour laws.

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C... ...208F01BA34EC

7.5  **Suppliers**.  We have the right to approve or disapprove any supplier to your Restaurant or to the System. From time to time, we may enter into or require national or regional exclusive supply arrangements with one or more independent suppliers for certain approved products. In evaluating the need for an exclusive supplier, we may take into account, among other things, the uniqueness of the product; the projected price and required volume of the product; the investment required and the ability of the supplier to meet the required quality and quantity of the product; the availability of qualified, alternative suppliers; the duration of the exclusivity; and the desirability of competitive bidding.

7.6  **Complaints.**  You must submit to us copies of any customer complaints relating to the Restaurant or Premises. You must submit to us copies of any communications from public authorities about actual or potential violations of laws or regulations relating to the operation or occupancy of the Restaurant or Premises. We will specify from time to time the manner of submission of this information to us.

7.7  **Courtesy.**  The parties will continuously strive to treat each other with courtesy and respect in all aspects of the franchise relationship.

## SECTION 8.  REPAIRS, MAINTENANCE, REFURBISHMENT AND REMODEL

8.0  **Repairs and Maintenance**: You agree to continuously maintain the Restaurant and Premises, including all fixtures, furnishings, signs and equipment, in the degree of cleanliness, orderliness, sanitation and repair, as prescribed by our Standards. You agree to make needed repairs (and replacements) to the Restaurant and Premises, including all fixtures, furnishings, signs and equipment, on an ongoing basis to ensure that your use and occupancy of the Restaurant and Premises conform to our Standards at all times. You are responsible for the costs associated with maintenance, repairs and replacements, alterations and additions.

8.1  **Refurbishment and Remodel**: No later than the Refurbishment Dates described in the Contract Data Schedule, you must refurbish the Restaurant in accordance with our then-current refurbishment Standards as generally described below. No later than the Remodel Dates described in the Contract Data Schedule, you must remodel the Restaurant in accordance with our then-current remodel Standards as generally described below, including those relating to fixtures, furnishings, signs and equipment. You are responsible for the costs of Refurbishments and Remodels.

Our refurbishment Standards generally include, but are not limited to, enhancements, improvements or upgrades to:  exterior lighting and signage, pre-order board or other drive-thru equipment and signage, landscape design, new style wall covering and countertops, current seating and guest experience packages and/or production equipment or technology.

Our remodel Standards generally include, but are not limited to, enhancements, improvements or upgrades to the: site, building, equipment, technology and operational systems as necessary to bring the Restaurant up to the then-current Brand image and Standards.

8.2  You may not defer your ongoing obligation to maintain, repair and replace because of a forthcoming refurbishment or remodel, or defer a scheduled refurbishment or remodel due to recent maintenance.

## SECTION 9.  PROPRIETARY MARKS

9.0  You agree to use only the Proprietary Marks we designate and in the manner that we approve. You may use and display such Proprietary Marks only in connection with the operation of the Restaurant and in compliance with our Standards.

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C -208F01BA34EC

9.1 You may not use the Proprietary Marks to advertise or sell products or services through the mail or by any electronic or other medium, including the internet, without our prior written approval. Our right of approval of any internet usage of our Proprietary Marks includes approval of the domain names and internet addresses, website materials and content, social media, and all links to other sites. We have the sole right to establish an internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by our franchisees.

9.2 You agree not to use the Proprietary Marks or the names "*Baskin-Robbins*", "*Baskin*", "*BR*", "*31 Flavors*" or anything confusingly similar as part of your corporate or other legal name, or as part of any e-mail address, domain name, social media accounts, or other identification of you or your business, in any medium. In all approved uses of the Proprietary Marks on your business forms such as your letterhead, invoices, order forms, receipts, and contracts, you must identify yourself as our franchisee and your business as independently owned and operated.

9.3 You have no rights in the Proprietary Marks or our System other than those explicitly granted in this Agreement, and you may not sublicense the Proprietary Marks.

9.4 You agree to notify us promptly of any litigation relating to the Restaurant or the Proprietary Marks. In the event we undertake the defense or prosecution of any such litigation, you agree to execute any and all documents and do such acts and things as may be necessary, in the opinion of our counsel, to carry out such defense or prosecution.

9.5 We will save, defend, indemnify and hold you and your successors and assigns harmless, from and against (i) any and all claims based upon, arising out of, or in any way related to the validity of your approved use of the Proprietary Marks and (ii) any and all expenses and costs (including reasonable attorney's fees) incurred by or on behalf of you in the defense against any and all such claims.

## SECTION 10. RESTRICTIVE COVENANTS

10.0 You acknowledge that, as our franchisee, you will receive specialized training, including operations training, in the System that is beyond your present skills and those of your managers and employees. You further acknowledge that you will receive access to our confidential and proprietary information including methods, practices and products, which will provide a competitive advantage to you. As a condition of training you, sharing our confidential and proprietary information with you and granting you a license to operate the Restaurant within our System and use our intellectual property, we require the following covenants in order to protect our legitimate business interests and the interests of other franchisees in the System:

10.1 During the Term of this Agreement, neither you nor any shareholder, member, partner, officer, director or guarantor of yours, or any person or entity who is in active concert or participation with you or who has a direct or indirect beneficial interest in the franchised business, may have a direct or indirect interest in, perform any activities for, provide any assistance to, sell any approved products to, or receive any financial or other benefit from any business or venture that sells products that are the same as or substantially similar to those sold in Baskin-Robbins restaurants, except for i) other Baskin-Robbins restaurants that we franchise to you or ii) real property owned by you; provided, however, no business located on the real property may either a) be an ice cream or frozen treat store or b) derive more than 15% of its overall revenue from products that are the same as or substantially similar to those sold in Baskin-Robbins restaurants; divert or attempt to divert any Baskin-Robbins business or customer away from the Restaurant or the System; oppose the issuance of a building permit, zoning variance or other governmental approval required for the development of another Baskin-Robbins restaurant; or perform any act injurious or prejudicial to the goodwill associated with the Proprietary Marks or System.

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C: -208F01BA34EC

10.2 For the first twenty-four months following the expiration or termination of this Agreement or transfer of an interest in the franchised business (the "Post-Term Period), neither you nor any shareholder, member, partner, officer, director or guarantor of yours, or any person or entity who is in active concert or participation with you or who has a direct or indirect beneficial interest in the franchised business, may have any direct or indirect interest in, perform any activities for, provide any assistance to or receive any financial or other benefit from any business or venture (other than an ownership interest in real property ) that sells products that are the same as or substantially similar to those sold in Baskin-Robbins restaurants and located within **five (5) miles** from the Restaurant or any other Baskin-Robbins restaurant that is open or under development. The restriction in the previous sentence does not apply to your ownership of less than two percent (2%) of a company whose shares are listed and traded on a national or regional securities exchange. The Post-Term Period begins to run upon your compliance with all of your obligations in this Section.

10.3 During the Term of this Agreement and at any time thereafter, neither you nor any shareholder, member, partner, officer, director or guarantor of yours, or any person or entity who is in active concert or participation with you or who has a direct or indirect beneficial interest in the franchised business, may contest, or assist others in contesting, the validity or ownership of the Proprietary Marks in any jurisdiction; register, apply to register, or otherwise seek to use or in any way control the Proprietary Marks or any confusingly similar form or variation of the Proprietary Marks; or reproduce, communicate or share any Confidential Information with anyone, or use for the benefit of anyone, except in carrying out your obligations under this Agreement.

10.4 You agree that a breach of the covenants contained in this Section will be deemed to threaten immediate and substantial irreparable injury to us and give us the right to obtain immediate injunctive relief without limiting any other rights we might have. If a court or other tribunal having jurisdiction to determine the validity or enforceability of this Section determines that, strictly applied, it would be invalid or unenforceable, then the time, geographical area and scope of activity restrained shall be deemed modified to the minimum extent necessary such that the restrictions in the Section will be valid and enforceable.

10.5 For purposes of this Agreement, the term "Confidential Information" means information relating to us or the Baskin-Robbins System that is not generally available to the public, including manuals, recipes, products, other trade secrets and all other information and know-how relating to the methods of developing, operating and marketing the Restaurant and the System. You must use best efforts to protect the Confidential Information.

10.6 If Franchisee is a legal entity, such entity's organizing documents shall provide that its purpose is limited to the following:

10.6.1 To develop, acquire, own and operate one or more Dunkin' Donuts and/or Baskin-Robbins franchises, and to conduct all business and financing activities related to those franchises;

10.6.2 To develop, acquire, own and lease any real or personal property used in connection with such franchises, including the financing of same;

10.6.3 To guarantee, co-sign or lend credit, and to secure such obligations by mortgaging, pledging, or otherwise transferring a security interest in your assets (excluding the Franchise Agreement, except and only to the extent and for so long as any applicable law requires that a franchisor permit a franchisee to grant a security interest in the Franchise Agreement) with respect to each of the following:

    a. another Dunkin' Donuts and/or Baskin-Robbins franchised business or Dunkin' Donuts management company that qualifies as an Affiliate (as defined in (10.6.4) below);
    b. an entity, of which you are a member, that operates or owns or leases real estate or equipment to a Dunkin' Donuts central kitchen;
    c. a real estate entity that both: (i) is an Affiliate or is directly or indirectly owned or controlled by you,

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C: -208F01BA34EC

by an Affiliate, by one or more of your shareholders, or by any person or organization that directly or indirectly owns shares in an Affiliate of yours, and (ii) owns, acquires and/or develops real estate used for Dunkin' Donuts and/or Baskin-Robbins restaurants approved by us (for real estate that includes a Dunkin' Donuts and/or Baskin-Robbins as part of a multi-use project, in addition to an Option to Assume, we require a non-disturbance agreement acceptable to us that permits us to operate or refranchise the restaurant in the event of a default under your loan, pledge, mortgage or similar instrument. Notwithstanding anything to the contrary, in no event may Franchisee guarantee, co-sign, lend credit, mortgage, pledge or otherwise transfer a security interest in your assets with respect to real estate that does not include a Dunkin' Donuts and/or Baskin-Robbins business).

10.6.4 For purposes of this Agreement, an Affiliate means a corporation, partnership or limited liability company whose equity is owned in whole in part by (a) one or more of your shareholders, (b) one or more parent, spouse, sibling, child or grandchild or another blood relation of a shareholder(s) of yours, (c) a trust, family limited partnership or similar organization that we have approved as a shareholder and of which at least one of your shareholders is a settlor, trustee or beneficiary (or equivalent), or (d) or another entity that we have approved to hold an equity interest in you.

10.7 We have the exclusive right to use and incorporate into our System all modifications, changes, and improvements developed or discovered by your employees, agents or you in connection with the franchised business, without any liability or obligation to your employees, agents or you.

## SECTION 11. MAINTENANCE AND SUBMISSION OF BOOKS, RECORDS AND REPORTS

11.0 You are required to keep business records in the manner and for the time required by law, and in accordance with generally accepted accounting principles. You are required to keep any additional business records that we specify in writing from time to time, in the manner and for the time we specify. Our requirements may take the form of written guidelines. All records must be in English, and whether on paper or in an electronic form, must be capable of being reviewed by us without special hardware or software. You must retain copies of each state and federal tax return for the franchised business for a period of five years.

11.1 You must submit profit and loss statements to us on a monthly basis, and, at our request, balance sheets for your fiscal half-year and year-end, all in the format and by the means that we specify from time to time. If we specify additional records for periodic reporting, you agree to submit those records as required.

11.2 Within fifteen days from our request and at our option, you agree to (a) photocopy and deliver to us those required records that we specify, or (b) at a location acceptable to us, provide us access to any required records that we specify for examination and photocopying by us. You agree to grant us the right to examine the records of your purchases kept by any of your suppliers or distributors, including the National DCP or any successor entities, and hereby authorize those suppliers and distributors to allow us to examine and copy those records at our own expense. If after we review your business records, which include your business tax returns, we believe that intentional underreporting of Gross Sales may have occurred, then upon request, you and any signatory and guarantor of this Agreement must provide us with personal federal and state tax returns and personal bank statements for the periods requested.

11.3 We will keep any records you provide to us that contain confidential information of yours confidential, provided such records are marked confidential and, by their nature, would be considered by a reasonable person to be confidential, but we may release information to any person entitled to it under any lease, to a prospective transferee of the Restaurant, in connection with anonymous general information disseminated to our franchisees and prospective franchisees, in the formulation of plans and policies in the interest of the System, or if required by law or any legal proceeding.

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C    -208F01BA34EC

## SECTION 12.  INSURANCE

12.0 Prior to opening or operating the Restaurant for business, and prior to constructing the Restaurant in the event you are developing the Restaurant, you agree to acquire insurance coverage of the type and in the amounts required by law, by any lease or sublease, and by us, as prescribed in our Standards. You must maintain such coverage in full force and effect throughout the duration of this Agreement. We have the right to change requirements from time to time. All insurance must be placed and maintained with insurance companies with ratings that meet or exceed our Standards. At our request, you must provide us with proof of required insurance coverages.

12.1 We and any affiliated party we designate must be named as additional insureds as our respective interests appear, and all policies must contain provisions denying to the insurer acquisition of rights of recovery against any named insured by subrogation. All policies shall include a provision prohibiting cancellations or material changes without thirty days prior written notice to all named insureds.  Policies may not be limited in any way by reason of any insurance that we (or any named party) may maintain. Upon our request, you must produce proof that you currently have the insurance coverage described in this Agreement, with all of the aforementioned provisions. In the event that such insurance coverage is not in effect, we have the right to purchase the necessary coverage for the Restaurant at your expense and to bill you for any premiums.

12.2 Both you and we waive any and all rights of recovery against each other and our respective officers, employees, agents, and representatives, for damage to the waiving party or for loss of its property or the property of others under its control, to the extent that the loss or damage is covered by insurance. To obtain the benefit of our waiver, you must have the required insurance coverage in effect. When you are obtaining the policies of insurance required by this subsection, you must give notice to your insurance carriers that the above mutual waiver of subrogation is contained in this Agreement.  This obligation to maintain insurance is separate and distinct from your obligation to indemnify us under the provisions of Section 14.9.

## SECTION 13.  TRANSFERS

13.0 **Transfer by Us**: This Agreement inures to the benefit of our successors and assigns, and we may assign our rights to any person or entity that agrees in writing to assume all of our obligations. Upon transfer, we will have no further obligation under this Agreement, except for any accrued liabilities.

13.1 **Transfer by You:** We entered into this Agreement based on the qualifications of your owners and you. Any direct or indirect transfer of interest in this Agreement or Franchisee requires our prior written consent, which we will not unreasonably withhold. Among other reasons, we may withhold consent if a proposed transferee does not meet our then-current criteria, if you have not satisfied all of your outstanding obligations to us, if the Restaurant and Premises are not in compliance with our Standards, or if we believe that the sale price of the interest to be conveyed is so high, or the terms of sale so onerous, that it is likely the transferee would be unable to properly operate, maintain, upgrade and promote the Restaurant and meet all financial and other obligations to us and to third parties. At the time of transfer, you and all of your direct and indirect shareholders, partners and members must execute a general release of us and our parent and affiliates, in our then-current standard form. If after an approved transfer, a shareholder, member or partner no longer has an interest in the franchised business, then such party is relieved of further obligations to us under the terms of this Agreement, except for money obligations through the date of transfer and obligations under Section 10.

13.2 **Transfer Fee.**  At transfer, you must pay us a Transfer Fee of seven thousand five hundred dollars

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C -208F01BA34EC

($7,500.00), whether or not we exercise our rights in Section 13.4.

13.2.1 In lieu of the Transfer Fee, we will only charge our then-current Fixed Documentation Fee if the original signatories to the Franchise Agreement retain more than fifty percent (50%) of the shares after the transfer, or if all of the interests transfer to the spouse(s) or children of the original signatories or to beneficiaries or heirs of an owner who dies or becomes mentally incapacitated.

13.3 **Transfer on Death**: Within twelve (12) months from the death of you or any of your owner(s) and notwithstanding any agreement to the contrary, the deceased's legal representative must propose to us in writing to transfer the interest of the deceased in this Agreement to one or more transferees. Any such transfer must occur within twelve months from such individual's death, and is subject to our prior written consent, which we will not unreasonably withhold, in accordance with this Section. This Agreement shall automatically terminate if the transfer has not occurred within twelve (12) months, unless we grant an extension in writing.

13.4 **Right of First Refusal**: We have a right of first refusal to be the purchaser in the event of any proposed direct or indirect sale of interest in this Agreement or you, under the same terms and conditions contained in the offer or purchase and sale document. You must provide us with a fully-executed copy of any offer or purchase and sale document (including any referenced documents) for the sale and simultaneously submit to us an executed copy of the Rider to Contract for Sale (along with the exhibits that we require to be submitted for transfers), and we will have sixty (60) days from our receipt of a completed package to notify you whether we are exercising our right. We may purchase the interest ourselves or assign our right to exercise and/or purchase the interest without recourse to a nominee who will purchase the interest directly from you. In the event you modify the offer or terms of sale in any way, you must resubmit the modified offer or purchase and sale document, as modified, and we will again have sixty (60) days to exercise the right of first refusal. For the avoidance of doubt, if the proposed transfer involves the transfer of ownership of real estate or other assets that are not directly related to the operation of the franchised business, we may elect to exercise our right of first refusal with respect to all of the assets or only that portion of the assets directly related to the operation of the franchised business. If the proposed transfer involves consideration other than money (including without limitation consideration that is unique to Seller or Seller's buyer under the Contract for Sale), then we reserve the right to disapprove the Contract for Sale due to the inclusion of such consideration, or to substitute the cash equivalent of the fair market value of that portion of the consideration that is not money, and in such event, Seller agrees to pay for any of our costs related to determining the fair market value of any such consideration.

## SECTION 14. DEFAULT AND REMEDIES

14.0 You will be in default under this Agreement under the following conditions:

14.0.1 You breach an obligation under this Agreement, or an obligation under another agreement, which agreement is necessary to the operation of the Restaurant.

14.0.2 You file a petition in bankruptcy, are adjudicated a bankrupt, or a petition is filed against you and is either consented to by you or not dismissed within thirty days; or you become insolvent or make an assignment for the benefit of creditors; or a bill in equity or other proceeding for the appointment of a receiver or other custodian for your business assets is filed and is either consented to by you or not dismissed within thirty days; or a receiver or other custodian is appointed for your business or business assets; or proceedings for composition with creditors is filed by or against you; or if your real or personal property is sold at levy.

14.0.3 You or your owners are convicted of or plead guilty or no contest to a felony or crime involving moral turpitude, or any other crime or offense that is injurious to our System or the goodwill enjoyed by our Proprietary Marks.

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C1 -208F01BA34EC

14.0.4 You or your owners commit a fraud upon us or a third party relating to a business franchised or licensed by us.

14.0.5 You use or permit the use of any business franchised or licensed by us, including the Restaurant or Premises, for an unauthorized purpose.

14.0.6 We terminate any other franchise agreement with you or any affiliated entity by reason of a default under sections 14.0.3, 14.0.4 or 14.0.5.

14.1 You will have the following opportunities to cure a default under this Agreement.

14.1.1 **Thirty-Day Cure Period**. Except as otherwise provided, you must cure any default under this Agreement within thirty (30) days after delivery of notice of default to you in our then-standard form or forms of communication.

14.1.2 **Seven-Day Cure Period**. If you do not pay the money owed to us or the Advertising Fund when due, or if you fail to maintain the insurance coverage required by this Agreement, you must cure that default within seven (7) days after delivery of notice of default to you in our then-standard form or forms of communication.

14.1.3 **Twenty-Four Hour Cure Period**. If you violate any law, regulation, order or Standard relating to health, sanitation or safety, or if you cease to operate the restaurant for a period of forty-eight (48) hours without our prior written consent, you must cure that default within twenty-four (24) hours after delivery of notice of default to you in our then-standard form or forms of communication.

14.1.4 **Cure on Demand**. You must destroy any product or cure any situation that, in our opinion, poses an imminent risk to public health and safety, at the time we demand you do so.

14.2 **No Cure Period**. No cure period will be available if you are in default under paragraphs 14.0.2 through 14.0.6; if you abandon the Restaurant; if you intentionally under-report Gross Sales or otherwise commit an act of fraud with respect to your acquisition or performance of this Agreement; or if your lease for the Restaurant is terminated. In addition, no cure period will be available for any default if you already have received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not you have cured the default), within the immediately preceding twelve-month period.

14.3 **Statutory Cure Period**. If a default is curable under this Agreement, and the applicable law in the state in which the Premises is located requires a longer cure period than that specified in this Agreement, the longer period will apply.

14.4 In addition to all the remedies provided at law or by statute for the breach of this Agreement, we also have the following remedies:

14.4.1 If we believe a condition of the Premises or of any product pose a threat to the health or safety of your customers or other persons at the Premises, we have the right to take such action as we deem necessary to protect these persons, and the goodwill enjoyed by our Proprietary Marks and System. Such actions may include any or all of the following: we may require you to immediately close and suspend operation of the Restaurant and correct such conditions; we may immediately remove or destroy any products that we suspect are contaminated; and, if you fail to correct a hazardous condition on demand, and within a reasonable time, we and contractors we hire may enter the Restaurant without being guilty of, or liable for, trespass or tort, and correct the condition. You are solely responsible for all losses or expenses incurred in complying with the provisions of this subsection. Further, if you should discover a hazardous condition as described above, you agree to notify us immediately.

DocuSign Envelope ID: 559FFD66-1944-43C   -208F01BA34EC

14.4.2 If after proper notice and opportunity to cure, you have not complied with a Standard involving the condition of the Restaurant, including maintenance, repair, and cleanliness, we and contractors we hire may enter the Restaurant without being guilty of, or liable for, trespass or tort, and correct the condition at your expense.

14.4.3 If you are repeatedly in default of this Agreement, we may disapprove your participation in the sale of new products or new programs until you cure your defaults and demonstrate to our reasonable satisfaction that you can maintain compliance with Standards.

14.4.4 You will pay to us all costs and expenses, including reasonable payroll and travel expenses for our employees, and reasonable investigation and attorneys' fees, incurred by us in successfully enforcing (which includes achieving a settlement) any provisions of this Agreement.

14.5   Because of the importance of your compliance with Standards to protect our System, other franchisees, and the goodwill enjoyed by our Proprietary Marks, you agree that the remedies described elsewhere in this Agreement, as well as monetary damages or termination at a future date, may be insufficient remedies for a breach of our Standards. Accordingly, you agree not to contest the appropriateness of injunctive relief for such breaches, and consent to the grant of an injunction in such cases without the showing of actual damages, irreparable harm or the lack of an adequate remedy at law. In order to obtain an injunction, we must show only that the Standard in issue was adopted in good faith, that it is a Standard of general applicability in that DMA or "region" (as that term is defined by us), and that you are violating or are about to violate that Standard. A Standard of general applicability is one that applies to all franchisees in the DMA or region, or throughout the Baskin-Robbins System.

14.6   **Termination and Expiration**.  If you commit a default referenced in section 14.2 or if you fail to timely cure any default that may be cured, we may terminate this Agreement.   Termination will be effective immediately upon receipt of a written notice of termination unless a notice period is required by law, in which case that notice period will apply.  Upon termination or expiration of this Agreement, you no longer have any rights granted by this Agreement. If we suffer your continued operation of the Restaurant while we seek judicial enforcement of the expiration or our election to terminate, then our conducting business as if the Agreement had not expired or been terminated in order to preserve the reputation of our System and goodwill associated with the Proprietary Marks, and our adherence to the judicial process, is neither a waiver of our election to terminate nor an extension of the termination date.

14.7  In the event of termination or expiration of this Agreement:

14.7.1 You must pay all monies owed under this Agreement, including any fees and interest, within ten days.

14.7.2 You must immediately cease operation of the Restaurant and no longer represent yourself to the public as our franchisee.

14.7.3 You must immediately cease all use of our Proprietary Marks, trade secrets, confidential information, and manuals, and cease to participate directly or indirectly in the use or benefits of our System.

14.7.4 You must, within ten days, return all originals and copies of our operating manuals, plans, specifications, and all other materials of ours in your possession relating to the operation of the Restaurant, all of which you acknowledge to be our property. The remaining materials are your property.

14.7.5 Upon our request within thirty (30) days from the date of termination due to default, you agree to sell to us any or all of the furniture, fixtures, and equipment at the purchase cost when originally installed in the Restaurant, less a depreciation deduction computed on a straight-line basis over a ten (10) year useful life for

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C -208F01BA34EC

the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings);

14.7.6 Upon our request within thirty days from the date of termination or expiration, you must assign to us any leasehold interest you have in the Restaurant and Premises or any other agreement related to the Premises.

14.7.7 Upon our request within thirty days from the date of termination due to default or expiration, you must remove from the Restaurant and Premises and return to us all indicia of our Proprietary Marks. Further, you must make such modifications or alterations to the Restaurant and Premises as we require in accordance with our Standards to distinguish the Restaurant and Premises from the premises of other restaurants in the System. You must also disconnect any telephone listings that contain our name, and withdraw any fictitious name registration containing any part of our Proprietary Marks. You hereby appoint us as your attorney-in-fact, and in your name, to do any act necessary to accomplish the intent of this section. In the event you fail or refuse to comply with the requirements of this section, we have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at your expense, which you agree to pay upon demand.

14.8 You agree that the existence of any claims against us, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by us of any provision of this Agreement

14.9 **Indemnification.** You will indemnify and hold us, our parent, subsidiaries and affiliates, including our and their respective members, officers, directors, employees, agents, successors and assigns, harmless from all claims related in any way to the operation, possession or ownership of the Restaurant or the Premises (including without limitation those relating to the Restaurant's employees), or any debt or obligation of yours. This indemnification covers all fees (including reasonable attorneys' fees), costs and other expenses incurred by us or on our behalf in the defense of any claims, and shall not be limited by the amount of insurance required under this Agreement. Our right to indemnity shall be valid notwithstanding any joint or concurrent liability that may be imposed on us by statute, ordinance, regulation or other legal requirement or decision. We will notify you of any claims covered by this paragraph, and you shall have the opportunity to assume the defense of the matter. We shall have the right to participate in any defense that is assumed by you, at our own cost and expense. No settlement of any claim against us shall be made without our prior written consent if we would be subjected to any liability not covered by you or your insurer.

## SECTION 15. DISPUTE RESOLUTION

15.0 **Waiver of Rights**: Both we and you waive and agree not to include in any pleading or arbitration demand: class action claims; demand for trial by jury; claims for lost profits (expressly excluding any fees due to us now or in the future under this Agreement); or claims for punitive, multiple, or exemplary damages. If any pleading is filed that contains any of these claims or a jury demand, or if a court determines that all or any part of the waivers are ineffective, then the pleading shall be dismissed with prejudice, leaving the pleading party to its arbitration remedy. No claim by either of us can be consolidated with the claims of any other party. If such claims and demands cannot be waived by law, then the parties agree that any recovery will not exceed two (2) times actual damages.

15.1 **Arbitration**: Either of us, as plaintiff or claimant, may choose to submit a dispute to a court or to arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules (or another nationally established arbitration association acceptable to you and us) and under the Federal Rules of Evidence. The plaintiff or claimant's election to arbitrate or to submit the dispute to the court system, including any compulsory counterclaims, is binding on the parties except that we shall have the option to submit to a court any of the following actions: to collect fees due under this Agreement; for injunctive relief; to protect our intellectual property, including Proprietary Marks; and to terminate this Agreement for a default.

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C    -208F01BA34EC

For any arbitration, the arbitrator(s) shall issue a reasoned award, with findings of fact and conclusions of law. The arbitration award and the decision on any appeal will be conclusive and binding on the parties. Actions to enforce an express obligation to pay money may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules. The place of arbitration shall be in the state in which the Restaurant is located. The Federal Arbitration Act shall govern, excluding all state arbitration law. Massachusetts's law shall govern all other issues. All claims and counterclaims brought by either party in arbitration shall be subject to the applicable statute(s) of limitations.

15.2 **Scope of Arbitration:** Disputes concerning the validity or scope of this Section, including whether a dispute is subject to arbitration, are beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. The provisions of this Section shall continue in full force and effect subsequent to any expiration or termination of this Agreement.

15.3 **Appeals:** Either party may appeal the arbitrator's final award to a panel of three arbitrators chosen under the Optional Appellate Rules of the AAA.

## SECTION 16. MISCELLANEOUS

16.0 If you directly or indirectly acquire ownership or control of the Premises, you must promptly give us written notice of such ownership or control and execute our then-standard agreement giving us the option to lease the Premises from you if you default under this Agreement or under any lease relating to the Restaurant or Premises. The lease will be for the then-remaining term of this Agreement, including any extension or renewal, at "triple-net" fair market value rent for comparable Baskin-Robbins locations with arms-length leases. If the parties cannot agree on the fair market value, they will consult a mutually-acceptable real estate professional.

16.1 You are an independent contractor of ours and not our agent, partner or joint venturer. You and we do not jointly employ any Restaurant management or other personnel working the Restaurant. Neither party has the power to bind the other. Nothing in this Agreement contemplates a fiduciary relationship. Neither party is liable for any act, omission, debt or any other obligation of the other, and you and we agree to indemnify and save each other harmless from any such claim and the cost of defending such claim.

16.2 Our waiver of your breach of any term of this Agreement applies only to that one breach and that one term, and not to any subsequent breach of any term. Acceptance by us of any payments due under this Agreement shall not be deemed to be a waiver by us of any preceding breach by you of any term. If we accept payments from any person or entity other than you, such payments will be deemed made by such person as your agent and not as your successor or assignee. We may waive or modify any obligation of other franchisees under agreements similar to this Agreement, without any obligation to grant a similar waiver or modification to you. If, for any reason, any provision of this Agreement is determined to be invalid or to conflict with an existing or future law, then the remaining provisions will continue to bind the parties and the invalid or conflicting provision will be deemed not to be a part of this Agreement.

16.3 The parties' rights and remedies are cumulative. Neither you nor your successor may create or assert any security interest or lien in this Agreement, without our prior written approval. You represent and warrant that you have established your operating agreement, by-laws or partnership agreement in accordance with the requirements of this Agreement. In the event of any conflict between a provision in this Agreement and a provision in your operating agreement, by-laws or partnership agreement, the provision of this Agreement will control.

16.4 Captions, paragraph designations and section or subsection headings are included in this Agreement for

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C -208F01BA34EC

convenience only, and in no way define or limit the scope or intent of the provisions. Wherever we use the word "including", it means "including but not limited to."

16.5 **Notices**. All notices shall be sent by nationally recognized overnight courier or certified mail to the addresses set forth in the Contract Data Schedule, or to such other addresses as you and we provide each other in writing. All notices to us shall be sent to us "c/o Dunkin' Brands, Inc., as Manager, Attention: Legal Department."

16.6 This Agreement and the documents referred to herein shall be the entire, full and complete agreement between you and us concerning the subject matter of this Agreement, which supersedes all prior agreements. Nothing in this Section, however, is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you. This Agreement is made in the Commonwealth of Massachusetts, USA, and any disputes that arise out of the relationship between the parties described by this Agreement, including but not limited to any pre-contractual dealings, shall be interpreted, construed and governed by the laws of the Commonwealth of Massachusetts. This Agreement may be executed in multiple counter-parts by facsimile or otherwise. This Agreement may only be modified in a writing signed by you and us.

**16.7 Your success in this business is speculative and depends, to an important extent, upon your ability as an independent business owner. We do not represent or warrant that the Restaurant will achieve a certain level of sales or be profitable, notwithstanding our approval of the location. By your signature below, you acknowledge that you have entered into this Agreement after making an independent investigation of the Baskin-Robbins System.**

**(The remainder of this page is intentionally left blank.)**

v.BR 4/2017

DocuSign Envelope ID: 559FFD66-1944-43C?-208F01BA34EC

Intending to be legally bound hereby, the parties have duly executed and delivered this agreement in duplicate, as of the date and year first written above. You hereby acknowledge receipt of this Franchise Agreement, including any addenda referenced in Item J, at least seven (7) calendar days (or such longer period as is required by state law) prior to the date hereof. You further acknowledge having carefully read this agreement in its entirety, including all addenda identified above and the Personal Guarantee below (if applicable).

Baskin-Robbins Franchising LLC

By: _____

*Sara Chetwynde-Johnson*

Sara Chetwynde-Johnson, Assistant Secretary

This agreement is not binding upon the above entity or entities until executed by an authorized representative.

**YOU ACKNOWLEDGE SECTION 15 OF THE TERMS & CONDITIONS, WHICH PROVIDES FOR YOUR EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES.**

FRANCHISEE:

By: _____

*Alan A. Chun*

Alan A. Chun, Individually

19

PC # 334725
Address: 901d Edgewater Blvd, Foster City, California 94404

## CERTIFICATION OF AGREEMENT

By signing below, you acknowledge that you received our Franchise Disclosure Document ("FDD") and have had the opportunity to review it and obtain the advice of an attorney.  Your answers to the questions below will provide us with an opportunity to correct any possible misunderstandings prior to entering into the attached agreement with you ("Agreement").  Therefore, your certification is important and we will act in reliance upon your answers below in signing the Agreement.

Other than what is written in the Agreement or FDD, describe below any information provided by any employee or agent of our company that has influenced your decision to sign the Agreement.

If the answer is "none," please write "NONE" below.

     None

Other than the historical information that is provided in Items 7 or 19 (including the Notes sections) of our FDD, describe below any information provided by any employee or agent of our company about your future financial performance, including sales, costs or profits, that has influenced your decision to sign the Agreement.

If the answer is "none," please write "NONE" below.

     None

If you do not complete and sign this page, we will not counter-sign the Agreement (or, if that has already taken place, we have the right to void the Agreement).

I certify that the above information is true, as of the same date as that on which the Agreement was signed.

FRANCHISEE:

By: ___*Alan A. Chun*_____
       —77C83736DB5E48A—
Alan A. Chun,  Individually

20

DocuSign Envelope ID: 559FFD66-1944-43C...-208F01BA34EC

BR Store Transfer Sales Increase Incentive 04-2017

This incentive is available to purchasers of existing Baskin-Robbins stand-alone Restaurants

**PC # 334725**

<u>**BASKIN-ROBBINS STORE TRANSFER SALES INCREASE INCENTIVE**</u>

<u>**ADDENDUM TO FRANCHISE AGREEMENT**</u>

*Introduction:*

*The following provisions are hereby incorporated into the Franchise Agreement ("FA") and supplement and modify the FA with respect to the obligations imposed and benefits received by each party. For the sake of convenience, Baskin-Robbins Franchising LLC is referred to in this Addendum as "**Franchisor**." You are referred to in this Addendum as "**Franchisee**." In the event of any conflict between a provision in this Addendum and a provision in the FA, the provision in this Addendum shall control.*

<u>**BE ADVISED**</u>**:  No employee or agent of our company is authorized to provide you with any information about the financial performance, including sales, costs or profits, of any restaurant other than the historical information that is provided in Items 7 or 19 (including the Notes sections) of our Franchise Disclosure Document.**

The following sales increase incentive awards are available to purchasers of existing Baskin-Robbins stand-alone restaurants who meet the sales increase incentive award criteria as well as the other terms and conditions set forth below:

1. <u>**Sales Increase Incentive Awards**</u>**:**

    Eligible Franchisees who meet the sales increase incentive award criteria set forth in paragraph 2 below (the "Award Criteria") will receive one of the following credits (based on the amount of sales increase) for this Restaurant for the first 52-week sales reporting period beginning the Sunday following the Transfer Date (as defined below):

    - Sales increase of at least 15% - credit equal to one-half of a percent (.5%) of gross sales
    - Sales increase of at least 20% - credit equal to one percent (1.0%) of gross sales
    - Sales increase of at least 25% - credit equal to one & one-half percent (1.5%) of gross sales
    - Sales increase of at least 31% - credit equal to two percent (2.0%) of gross sales.

    This credit will be applied to Franchisee's account for this Restaurant with Franchisor on or about the fourteenth (14th) month from the date the ownership of the Restaurant transfers to the buyer (the "Transfer Date"). Franchisee remains responsible for timely paying all fees when due and may not withhold payment in anticipation of receiving the foregoing credit.

    If the Restaurant is located in the Pacific Northwest, Alaska or Hawaii the credit earned will be applied toward ice cream purchases.

2. <u>**Sales Increase Incentive Award Criteria**</u>**:**

    A.  To qualify for the awards described in Paragraph 1 above, the average weekly comparable sales trend ("AWCST") for the restaurant during the first full fifty-two (52) week reporting period

1

DocuSign Envelope ID: 559FFD66-1944-43C...-208F01BA34EC

immediately following the day of the closing of the transfer must be at least fifteen percent (15%) more than the AWCST for the restaurant over the prior full fifty-two week reporting period that ended immediately prior to the closing of the transfer.

B.  By way of example only and not limitation, if the restaurant transferred on August 1, 2017 and the AWCST for the period commencing August 1, 2017 and ending July 31, 2018 as compared to the same period from the prior year was plus five percent (+5%) and:

  (i)  the AWCST for the period commencing August 1, 2016 and ending July 31, 2017 as compared to the same period from the prior year was negative five percent (-5%), then Franchisee would not qualify for the awards described in Paragraph 1 above because the increase in AWSCT was less than fifteen percent (15%) (i.e., it was ten percent (10%)); but,

  (ii)  if the AWCST for the period commencing August 1, 2016 and ending July 31, 2017 as compared to the same period from the prior year was negative eleven percent (-11%), then Franchisee would qualify for one of the awards described in Paragraph 1 above because the increase in AWSCT was equal to or greater than fifteen percent (15%) (i.e., it was sixteen percent (16%) thereby qualifying for a .5% credit on gross sales).

C.  Notwithstanding anything to the contrary contained herein Franchisor reserves the right to select another period or to make adjustments to such AWCST figures in the event extraordinary occurrences (e.g., road construction, fire or other casualty) materially affected the restaurant's sales during the period(s) referenced above.

3.  **Eligibility Requirements:**  From the Transfer Date up through the Award Date, Franchisee must timely report and pay all fees due to Franchisor and its affiliates, must retain a "YES" rating on the Franchise Business Review in all Baskin-Robbins restaurants, must timely submit profit and loss statements and must not otherwise be in default of any franchise agreement or other agreement with Franchisor or any of its affiliates, and must be in good standing with the Franchisor and its affiliates to be eligible to receive the sales increase incentive award.

4.  **No Guaranty; Not Transferable:  This sales increase incentive is not a guarantee that Franchisee will be profitable, experience a sales increase or experience any other type sales performance.**  This sales increase incentive is non-transferable, and if ownership of the restaurant is transferred prior to a credit being received or used by Franchisee, said credit(s) will be forfeited upon transfer.

5.  **Effect:**  Except as specifically provided above, the terms of the Franchise Agreement are unaffected by the terms of this Addendum.  The parties acknowledge and agree that this Addendum is subject, in all respects, to the other provisions of the Franchise Agreement.

Initials

DS
aC

2

# Exhibit 2



1888 Century Park East
Suite 1700
Los Angeles, CA 90067-1721

● +1.310.788.9900
● +1.310.788.3399
PerkinsCoie.com

June 25, 2018

Catherine N. Grech
CGrech@perkinscoie.com
D.  +1.310.788.3294
F.  +1.310.788.2832

EL328105199US

**BY USPS EXPRESS MAIL
AND FIRST CLASS MAIL**

EL328105208US

Alan A. Chun
d/b/a Baskin-Robbins
901-D Edgewater Place
Foster City, CA  94404

Alan A. Chun
d/b/a Baskin-Robbins
1722 Wolfe Drive
San Mateo, CA  94402

## NOTICE TO CURE

Re:   PC 334725
Baskin-Robbins
Account Balance Due: $17,157.56

Dear Franchisee:

Please be advised that this firm represents the interests of Baskin-Robbins Franchising LLC ("Dunkin' Brands"), with respect to your failure to comply with the requirements of the Franchise Agreement, pursuant to which you operate a franchised business at the address listed:

| Franchisee | Date of Agreement | Location of Business | PC No. | Brand |
|---|---|---|---|---|
| Alan A. Chun | 07/26/17 | 901-D Edgewater Blvd. Foster City, CA  94404 | 334725 | Baskin-Robbins |

Pursuant to your Franchise Agreement, this Notice shall serve as fifteen (15) days prior written notice that Dunkin' Brands intends to terminate your franchise for your failure to report gross sales and to make the following payments through June 20, 2018:

Franchise and Advertising Fees in the amount of $17,157.56

140330191.1

Perkins Coie LLP

June 25, 2018
Page 2

If you failed to provide Dunkin' Brands with reports of your gross sales as required by the Franchise Agreement, all or a portion of the outstanding Franchise Fees and Advertising Fees may have been estimated based upon prior sales.

You are required to cure these defaults within fifteen days by electronically submitting your sales to Dunkin' Brands via its FAST sales reporting system, and/or mailing your certified check in the amount of $17,157.56 to Dunkin' Brands, P O Box 2965, Carol Stream, IL 60132-2965. In addition, provide a copy of said check to Gary Zullig by email at gary.zullig@dunkinbrands.com or fax to 781-737-6212.

You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Brands in writing within seven (7) days of the receipt of this Notice of the substance of the dispute and provide Dunkin' Brands with any and all information supporting your claims. Dunkin' Brands will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Brands will not excuse your obligation to pay the amounts owed to Dunkin' Brands as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement.

This notice supplements any Notices of Default and/or Termination previously sent relating to this store. This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice. Failure to cure these defaults within fifteen days (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Brands, may result in termination of your Franchise Agreement.

Very truly yours,

Catherine Grech
CG:sej

cc:    Gary Zullig
       Wanda Bell
       Duane Jones
       Thomas Leeper



**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)    PHONE (        )

PERKINS COIE
1888 Century Park East, Suite 1700
Los Angeles, CA 90067

Attn: Jones / Grech
28028-4694.0001

EL 328105199 US

**UNITED STATES POSTAL SERVICE** ®

**PRIORITY MAIL EXPRESS**™

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.    Federal Agency Acct. No. or Postal Service™ Acct. No.

**DELIVERY OPTIONS (Customer Use Only)**
☐ **SIGNATURE REQUIRED** Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)    PHONE (        )

Alan A. Chun
d/b/a Baskin-Robbins
901-D Edgewater Place
Foster City, CA 94404

ZIP + 4® (U.S. ADDRESSES ONLY)
9  4  4  0  4

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

**ORIGIN (POSTAL SERVICE USE ONLY)**
☐ 1-Day    ☐ 2-Day    ☐ Military    ☐ DPO
PO ZIP Code    Scheduled Delivery Date (MM/DD/YY)    Postage $

Date Accepted (MM/DD/YY)    Scheduled Delivery Time    Insurance Fee $    COD Fee $
☐ 10:30 AM ☐ 3:00 PM
☐ 12 NOON

Time Accepted    10:30 AM Delivery Fee    Return Receipt Fee $    Live Animal Transportation Fee $
☐ AM
☐ PM

Weight    ☐ Flat Rate    Sunday/Holiday Premium Fee $    Total Postage & Fees $
lbs.        ozs.
    Acceptance Employee Initials

**DELIVERY (POSTAL SERVICE USE ONLY)**
Delivery Attempt (MM/DD/YY)    Time    Employee Signature
☐ AM
☐ PM

Delivery Attempt (MM/DD/YY)    Time    Employee Signature
☐ AM
☐ PM

LABEL 11-B, SEPTEMBER 2015    PSN 7690-02-000-9996    **2-CUSTOMER COPY**



**SENDER: COMPLETE THIS SECTION**
■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Alan A. Chun
d/b/a Baskin-Robbins
901-D Edgewater Place
Foster City, CA 94404

28028-4694·0001

9590 9402 2865 7069 5070 90

2. Article Number (Transfer from service label)
EL 328 105 199 US

**COMPLETE THIS SECTION ON DELIVERY**
A. Signature
X _____    ☑ Agent
                ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery
lily Seaver    8/17/18

D. Is delivery address different from item 1?    ☐ Yes
If YES, enter delivery address below:    ☑ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☑ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)   PHONE (    )

PERKINS COIE
1888 Century Park East, Suite 1700
Los Angeles, CA  90067

Attn:  Jones / Grech
28028-4694.0001

**PAYMENT BY ACCOUNT (if applicable)**

USPS® Corporate Acct. No.          Federal Agency Acct. No. or Postal Service™ Acct. No.

**DELIVERY OPTIONS (Customer Use Only)**

☐ **SIGNATURE REQUIRED** Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)*
☐ 10:30 AM Delivery Required (additional fee, where available)*
  *Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)   PHONE (    )

Alan A. Chun
d/b/a Baskin-Robbins
1722 Wolfe Drive
San Mateo, CA  94402

ZIP + 4® (U.S. ADDRESSES ONLY)

9  4  4  0  2

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

EL 328105208 US

**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL ★ EXPRESS™**

**ORIGIN (POSTAL SERVICE USE ONLY)**

☐ 1-Day    ☐ 2-Day    ☐ Military    ☐ DPO

PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage $

Date Accepted (MM/DD/YY) | Scheduled Delivery Time ☐ 10:30 AM ☐ 3:00 PM ☐ 12 NOON | Insurance Fee $ | COD Fee $

Time Accepted ☐ AM ☐ PM | 10:30 AM Delivery Fee $ | Return Receipt Fee $ | Live Animal Transportation Fee $

Weight | ☐ Flat Rate | Sunday/Holiday Premium Fee $ | Total Postage & Fees $

lbs. | ozs. | Acceptance Employee Initials

**DELIVERY (POSTAL SERVICE USE ONLY)**

Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature

Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature

LABEL 11-B, SEPTEMBER 2015   PSN 7690-02-000-9996   **2-CUSTOMER COPY**

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Alan A. Chun
d/b/a Baskin-Robbins
1722 Wolfe Drive
San Mateo, CA  94402

9590 9402 2865 7069 5067 89

2. Article Number (Transfer from service label)

EL 328 105208 145

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                               ☐ Agent
                                ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☑ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053      Domestic Return Receipt

# Exhibit 3

# PERKINSCOIE

1888 Century Park East
Suite 1700
Los Angeles, CA 90067-1721

● +1.310.788.9900
● +1.310.788.3399
PerkinsCoie.com

August 27, 2018

Catherine N. Grech
CGrech@perkinscoie.com
D. +1.310.788.3294
F. +1.310.788.2832

**Certified Article Number**

**9414 7266 9904 2024 5973 49**

**SENDERS RECORD**

**Certified Article Number**

**9414 7266 9904 2024 5973 32**

**SENDERS RECORD**

**VIA FEDERAL EXPRESS
CERTIFIED MAIL RETURN
RECEIPT REQUESTED AND
FIRST CLASS MAIL**

Alan A. Chun
d/b/a Baskin-Robbins
901-D Edgewater Place
Foster City, CA  94404

Alan A. Chun
d/b/a Baskin-Robbins
1722 Wolfe Drive
San Mateo, CA  94402

## NOTICE OF TERMINATION

> Re:   **PC 334725**
> **Baskin-Robbins Franchising LLC**

Dear Mr. Chun:

On or about June 25, 2018, you were sent a Notice to Cure with respect to your $17,157.66 delinquency under your Franchise Agreement listed below, for the address listed:

| Franchisee | Date of Agreement | Location of Business | PC No. | Brands |
|---|---|---|---|---|
| Alan A. Chun | 07/26/17 | 901-D Edgewater Place Foster City, CA  94404 | 334725 | Baskin-Robbins |

In the June 25, 2018 Notice, you were advised that your Franchise Agreement would be terminated if you failed to cure the defaults noted therein within fifteen (15) days after receiving the Notice.  More than fifteen (15) days have passed since the date you received the Notice to Cure, and you have failed to cure the defaults noted therein.  As such, these defaults constitute good cause to terminate under your Franchise Agreement.

**Accordingly, as permitted by the Franchise Agreement and for the reasons stated in this Notice, Dunkin' Brands, Inc. ("Dunkin'") is providing you with notice of the termination of the above-referenced Franchise Agreement <u>effective immediately</u>.**

Dunkin', as manager for Baskin-Robbins Franchising LLC, demands that you immediately pay it all damages it has suffered as a result of your defaults under the Franchise Agreements.  You are hereby notified, however, that receipt and retention of such payments, or additional amounts

August 27, 2018
Page 2

due pursuant to the Franchise Agreements, shall not constitute a "cure" or "waiver" with respect to these defaults preventing termination or requiring reinstatement of the Franchise Agreement.

Dunkin' further demands that upon termination you, your agents, servants and employees take such actions as are necessary to comply with your post-termination obligations as set forth in the Franchise Agreements, including but not limited to, ceasing to use any methods associated with Franchisor, ceasing to use any or all of the proprietary marks of Franchisor, returning all manuals to Franchisor, and complying with the post-termination obligations set forth in the Franchise Agreements.  Dunkin' reserves all of its post-termination rights.

You are advised that Dunkin' will submit this matter to a Court of competent jurisdiction seeking, among other things, judicial enforcement of the termination and your post-termination obligations, as well as damages, attorneys' fees, costs and interest.

Nothing in this Notice constitutes acquiescence by Dunkin' in your continued use of Franchisor's proprietary marks after the effective date of the termination.  You will remain obligated for all amounts already due, or that will become due, by virtue of your continued operation of the franchised business after your receipt of this Notice.  Any and all amounts paid by you, or to be paid by you, while operating during this period may be retained by Dunkin' without waiver of its rights and claims, including the right to terminate the Franchise Agreement and/or seek injunctive relief.  Any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' will not excuse your obligation to pay the amounts owed to Dunkin' as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement.

This notice supplements any Notices previously sent relating to these franchises.  This Notice does not supersede any prior Notices, nor does it constitute a waiver of any rights of Dunkin' or any of its subsidiaries have pursuant to any prior Notices or this Notice.

Please note that Dunkin's representatives may contact you after the date of this Notice with respect to operational and other issues, however they shall have no authority to modify the terms of this letter or the termination process.

Very truly yours,

Catherine N. Grech

cc:     Gary Zullig
        Duane Jones
        Thomas Leeper
        Chris Egan
        Jeffrey L. Karlin



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



**WA BWCA**

TRK#
0201

7730 7134 5284

TUE - 28 AUG 3:00P
STANDARD OVERNIGHT

94402
CA-US SFO

TO
ALAN A. CHUN
D/B/A BASKIN-ROBBINS
1722 WOLFE DRIVE

(310) 788-3286
INV:
PO:
SAN MATEO CA 94402
REF: 26026-4694.0001

DEPT:

ORIGIN ID:CIBA
SHARON JONES
1888 CENTURY PARK EAST
SUITE 1700
LOS ANGELES, CA 90067
UNITED STATES US
(310) 788-3286

SHIP DATE: 27AUG18
ACTWGT: 0.10LB
CAD: 392521/INET4040

BILL SENDER

FedEx
Express

J18211889150fuz

552J1/3309/DCA5

---

**After printing this label**:

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**Ex.**    Shipping    Tracking    Printing Services    Locations    Support             Sharon

**TRACK ANOTHER SHIPMENT**

773071277666

# Delivered
## Tuesday 8/28/2018 at 11:14 am

**DELIVERED**

Signed for by: E.KOLLURI



**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|---|---|
| Sharon Jones | d/b/a Baskin-Robbins |
| SUITE 1700 | Alan A. Chun |
| 1888 CENTURY PARK EAST | 901-D Edgewater Place |
| LOS ANGELES, CA US 90067 | SAN MATEO, CA US 94404 |
| 310 788-3286 | 310 788-3286 |

| Travel History | Shipment Facts |
|---|---|

| 8/28/2018 - Tuesday | 11:14 am | Delivered | ✕ |
| | | FOSTER CITY, CA | |

Expand History

| 8/27/2018 - Monday | 1:43 pm | Shipment information sent to FedEx |

Ask FedEx

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations

**MORE FROM FEDEX**

FedEx Blog
Corporate Responsibility
Newsroom

FedEx Compatible
Developer Resource Center
FedEx Cross Border

**LANGUAGE**

Change Country

English

Careers                    Contact Us

**FOLLOW FEDEX**

© FedEx 1995-2018                           Feedback    |    Site Map    |    Terms of Use    |    Security & Privacy

Ask FedEx

**Ex.**    Shipping    Tracking    Printing Services    Locations    Support                    Sharon

**TRACK ANOTHER SHIPMENT**

773071345284

# Delivered
## Tuesday 8/28/2018 at 3:20 pm

**DELIVERED**

Signature not required

**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|---|---|
| Sharon Jones | d/b/a Baskin-Robbins |
| SUITE 1700 | Alan A. Chun |
| 1888 CENTURY PARK EAST | 1722 Wolfe Drive |
| LOS ANGELES, CA US 90067 | SAN MATEO, CA US 94402 |
| 310 788-3286 | 310 788-3286 |

| **Travel History** | **Shipment Facts** |
|---|---|

| 8/28/2018 - Tuesday | 3:20 pm | Delivered |
|---|---|---|
| | | Left at front door. Package delivered to |
| | | recipient address - release authorized |
| | | SAN MATEO, CA |

Ask FedEx

**Expand History**

| 8/27/2018 - Monday | 1:47 pm | Shipment information sent to FedEx |
|---|---|---|

| **OUR COMPANY** | | **MORE FROM FEDEX** | **LANGUAGE** |
|---|---|---|---|
| About FedEx | FedEx Blog | FedEx Compatible | Change Country |
| Our Portfolio | Corporate Responsibility | Developer Resource Center | |
| Investor Relations | Newsroom | FedEx Cross Border | English |
| Careers | Contact Us | | |

Case 3:18-cv-05476   Document 1   Filed 09/06/18   Page 48 of 48

**FOLLOW FEDEX**

© FedEx 1995-2018          Feedback     |     Site Map     |     Terms of Use     |     Security & Privacy

Ask FedEx